## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. _____ |
| AMERICAN ZINC RECYCLING CORP., f/k/a HORSEHEAD CORP., | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs the United States of America, by authority of the Attorney General of the United States, at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the Attorney General for the State of Tennessee, at the request of the Tennessee Department of Environment and Conservation ("TDEC") (collectively referred to as "Plaintiffs"), file this Complaint and allege as follows:

## NATURE OF THE CASE

1.      This is a civil action by the United States and the State of Tennessee ("Tennessee") against American Zinc Recycling Corp. ("AZR" or "Defendant"), formerly known as Horsehead Corporation ("Horsehead"), for civil penalties arising from the generation, storage, treatment, management, and disposal of hazardous wastes at a facility in Rockwood, Roane County, Tennessee ("Rockwood Facility").

2.      This action is brought pursuant to Section 3008(a) of the Resource Conservation and Recovery Act ("RCRA"), as amended by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), 42 U.S.C. § 6928(a), and pursuant to the Tennessee Hazardous Waste

1

Management Act ("THWMA"), Tenn. Code Ann. § 68-212-114(b), for violations of the THWMA, Tenn. Code Ann. §§ 68-212-101 *et seq.* [Subtitle C of RCRA, 42 U.S.C. §§ 6921 to 6939f], and the implementing regulations set forth in the Tennessee Hazardous Waste Management Rules (Tenn. Comp. R. & Regs.), Chapter 0400-12-01 [40 C.F.R. Parts 260-270)].

## JURISDICTION, AUTHORITY AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

4.     Authority to bring this action on behalf of the United States is vested in the Attorney General of the United States and the Administrator of EPA, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 516 and 519.

5.     The Attorney General for the State of Tennessee is authorized to bring this action pursuant to Tenn. Code Ann. §§ 8-6-109 and -301, and at the request of TDEC pursuant to Tenn. Code Ann. §§ 68-212-101 *et seq.*

6.     Venue is proper in this District pursuant to Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1), and 28 U.S.C. §§ 1391 and 1395, because the Defendant conducts business in this District and the alleged violations occurred in this District.

## NOTICE

7.     As a signatory to this Complaint, Tennessee has notice of the commencement of this action. *See* 42 U.S.C. § 6928(a)(2).

## DEFENDANT

8.     "Defendant" is a Delaware corporation headquartered in Pittsburgh, Pennsylvania. Defendant is a foreign corporation in good standing in Tennessee. It has a registered agent located in Knoxville, Tennessee. Defendant produces specialty zinc and zinc-based products and

2

is a recycler of electric arc furnace dust ("EAF Dust"), an EPA-listed hazardous waste containing zinc generated by North American steel mills and identified with waste code K061. Several of Defendant's facilities recycle EAF Dust, including the Rockwood Facility at issue in this Complaint.

9. Defendant was formerly known as Horsehead Corporation. Defendant changed its name to American Zinc Recycling Corp. on or around May 1, 2017.

10. Defendant is a "person" as defined in 42 U.S.C. § 6903(15), Tenn. Code Ann. § 68-212-104(14), 40 C.F.R. § 260.10, and Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a).

11. Defendant is the current "owner" and "operator" of the Rockwood Facility, a "facility" and a "designated facility" located at 199 Truck Route, Rockwood, Tennessee, as those terms are defined in 40 C.F.R. § 260.10, and Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a).

12. Defendant is a "generator" of hazardous waste at the Rockwood Facility because, at the Rockwood Facility, Defendant generates materials which are wastes, which contain or are contaminated with hazardous waste and/or hazardous waste constituents or are derived from listed hazardous wastes. *See* Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

## STATUTORY AND REGULATORY AUTHORITY

### A. Federal Resource Conservation and Recovery Act

13. RCRA, enacted in 1976, amended the Solid Waste Disposal Act of 1965. Subtitle C of RCRA, 42 U.S.C. §§ 6901-6939b, authorized the "cradle-to-grave" regulation of hazardous waste. RCRA was amended in 1984 by the Hazardous Waste and Solid Waste Amendments ("HSWA"), Pub. L. 98-616, which added additional requirements, and revised and reorganized again, effective May 30, 2017. Pursuant to its authority under RCRA, EPA has promulgated

3

regulations at 40 C.F.R. Parts 124, 260-270, and 273 applicable to hazardous waste generators, transporters, owners, and operators of treatment, storage, and disposal facilities ("TSD facilities").

14.     RCRA Section 3006, 42 U.S.C. § 6926, provides that a state may obtain federal authorization to administer the RCRA hazardous waste program in that state. On February 5, 1985, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), Tennessee received final authorization to administer certain portions of the State hazardous waste program in lieu of the federal program set forth in RCRA, including those cited herein. *See* 50 Fed. Reg. 2,820. The provisions of the Tennessee hazardous waste management program, found in the THWMA (Tenn. Code Ann. §§ 68-212-101 through 68-212-509), and in the Tennessee Hazardous Waste Management Rules (Tenn. Comp. R. & Regs.), Chapter 0400-12-01, have become requirements of Subtitle C of RCRA, operate in lieu of the federal RCRA program, and are enforceable by the United States, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), upon notification to Tennessee.

15.     Pursuant to Section 3006(g) of RCRA, 42 U.S.C. § 6926(g), the requirements established by HSWA are immediately effective in all states upon their federal effective date regardless of their authorization status, and are implemented by EPA until a state is granted final authorization with respect to those requirements. The State of Tennessee received final authorization for certain portions of HSWA, including those recited herein.

16.     Although EPA has granted the State of Tennessee authority to enforce its own hazardous waste program, EPA retains jurisdiction and authority to initiate an independent enforcement action, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a). This authority

4

is exercised by EPA in the manner set forth in the Memorandum of Agreement between EPA and the State of Tennessee.

### A.    <u>Tennessee Statutory and Regulatory Authority</u>

#### *1.    Authority to Administer Hazardous Waste Program*

17.      As stated above, on February 5, 1985, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), and 40 C.F.R. Part 271, Subpart A, Tennessee received final authorization to administer certain portions of the State hazardous waste program in lieu of the federal program set forth in RCRA. *See* 50 Fed. Reg. 2,820. Since then, EPA has granted authorization for changes to the Tennessee hazardous waste management program several times, with the most recent occurring on March 20, 2015. *See* 80 Fed. Reg. 14,847.

#### *2.    Determination that a Material is a Solid Waste and a Hazardous Waste*

18.      The first step in determining whether RCRA applies to a material is determining whether the material is a "solid waste." In Tennessee, the term "solid waste" includes any discarded material that is not excluded under Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(d)1 [40 C.F.R. § 261.4(a)] or any discarded material that is not excluded by a variance granted under Tenn. Comp. R. & Regs. 0400-12-01-.01(4)(a) and (b) [40 C.F.R. §§ 260.30 and 260.31]. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(b)1(i) [40 C.F.R. § 261.2(a)(1)].

19.      Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(b)1(ii) [40 C.F.R. § 261.2(a)(2)] defines a "discarded material" as any material which is "abandoned," "recycled," "inherently waste-like," or "military munition," as those terms are defined in Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(b)2-4 [40 C.F.R. §§ 261.2(b)-(d)] and Tenn. Comp. R. & Regs. 0400-12-01-.09(13)(c) [40 C.F.R. § 266.202].

5

20.    The next step is determining whether the solid waste is a "hazardous waste." Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(1)(b) [40 C.F.R. § 262.11], a person who generates a solid waste must determine if that waste is a hazardous waste.

21.    A solid waste is a "hazardous waste" if it is not excluded from the definition of hazardous waste by Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(d)2 [40 C.F.R. § 261.4] and either exhibits characteristics of hazardous waste (*i.e.*, ignitability, reactivity, corrosivity, or toxicity), as identified in Tenn. Comp. R. & Regs. 0400-12-01-.02(3) [40 C.F.R. Part 261, Subpart C], or has been listed in Tenn. Comp. R. & Regs. 0400-12-01-.02(4) [40 C.F.R. Part 261, Subpart D], and has not been excluded from the list pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.01(3)(a) and (c) [40 C.F.R. §§ 260.20 and 260.22]. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(c) [40 C.F.R. § 261.3].

22.    Certain hazardous wastes are listed in Tenn. Comp. R. & Regs. 0400-12-01-.02(4) [40 C.F.R. Part 261, Subpart D] because they present a threat to human health or the environment when discarded. Certain solid wastes that are generated from specific industries or sources are listed as hazardous wastes. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(4)(c) [40 C.F.R. § 261.32].

23.    EAF Dust is listed as a hazardous waste, carrying the code K061, because it contains water leachable heavy metals and is toxic for hexavalent chromium, lead, and cadmium. Tenn. Comp. R. & Regs. 0400-12-01-.02(4)(c) & 0400-12-01-.02(30)(App. VII) [40 C.F.R. § 261.32 and Part 261, App. VII]. K061 is described as "emission control dust/sludge from the primary production of steel in electric furnaces." *Id.*

24.    Under the "Derived-From Rule" a solid waste that is generated from the treatment, storage, or disposal of a listed hazardous waste is itself also classified as a hazardous

6

waste, unless its constituents are present at levels low enough to be excluded, and it no longer exhibits the characteristics of a hazardous waste. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(c)3, 4, & 7 [40 C.F.R. §§ 261.3(c), (d), & (g)]. As such, wastes derived from EAF Dust, including EAF Dust slag/residue (*i.e.*, iron rich material ("IRM")) are also hazardous wastes, unless it can be established that they meet one of the exclusions outlined in Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(c)3, 4, & 7 [40 C.F.R. §§ 261.3(c), (d), & (g)].

25.    When materials derived from hazardous waste are used in a manner constituting disposal, Tenn. Comp. R. & Regs. 0400-12-01-.09(3) [40 C.F.R. § 266.20(b)] provides that such materials can be exempt from hazardous waste regulation if they meet specific conditions. Specifically, products produced for the general public's use that are used in a manner that constitutes disposal and that contain recyclable materials are not regulated wastes so long as "the recyclable materials have undergone a chemical reaction in the course of producing the products so as to become inseparable by physical means and if such products meet the applicable treatment standards" in Tenn. Comp. R. & Regs. 0400-12-01-.10(3) [40 C.F.R. Part 268, Subpart D] for each hazardous constituent and/or characteristic the recyclable hazardous waste originally contained.

### 3.    *Regulation of Hazardous Waste*

26.    A "generator" is defined as "any person, by site, whose act or process produces hazardous waste . . . or whose act first causes a hazardous waste to become subject to regulation." Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

27.    In Tennessee, generators of hazardous waste are regulated under three broad categories, depending on the amount of hazardous waste generated monthly. Relevant to this action, a Conditionally Exempt Small Quantity Generator ("CESQG") (now known as a Very

7

Small Quantity Generator ("VSQG") under the federal RCRA program) generates no more than one kilogram of acute hazardous waste or 100 kilograms of total hazardous waste per month, and as a practical matter is largely unregulated under RCRA. Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(e) [40 C.F.R. § 261.5 (effective June 16, 2010 through May 29, 2017)]; *see also* 40 C.F.R. § 262.13 (effective May 30, 2017). A Large Quantity Generator ("LQG") of hazardous waste is a person that generates more than 1,000 kilograms of hazardous waste per month or more than one kilogram of acute hazardous waste and is subject to more extensive waste management requirements in Tenn. Comp. R. & Regs. 0400-12-01-.03 [40 C.F.R. Part 262 (effective June 16, 2010 through May 29, 2017)] (*see also* 40 C.F.R. § 262.13 (effective May 30, 2017). These regulations require, among other things, installation identification numbers, notification requirements, record keeping and reporting, and demonstration of the length of time waste accumulates at the site. *See id.*

28.     The term "facility" includes "[a]ll contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste. . . . A facility may consist of several treatment, storage, or disposal operational units (*e.g.*, one or more landfills, surface impoundments, or combinations of them)." Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10]. For the purpose of implementing corrective action under Rule 0400-12-01-.06(6)(l) [40 C.F.R. § 264.101 or 267.101], the term "facility" includes all contiguous property under the control of the owner or operator seeking a permit under Tenn. Code Ann. §§ 68-212-101 *et seq.* [RCRA Subtitle C, 42 U.S.C. §§ 6901-6939b]. This definition also applies to facilities implementing corrective action under Tenn. Code Ann. § 68-212-111 [42 U.S.C. § 6928(h)]. Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

8

29.     In accordance with Tenn. Comp. R. & Regs. 0400-12-01-.07(3) [40 C.F.R. Part 270, Subpart G], a person who owns or operates a facility that is required to have a permit and for which an application for a permit has been submitted is in "interim status" for that facility, *i.e.*, is deemed to have been issued the permit provided that the person complies with the proper notification requirements specified in Tenn. Comp. R & Regs. 0400-12-01-.03(2). [*See also* RCRA § 3005(e), 42 U.S.C. § 6925(e)].

30.     The term "designated facility" means a hazardous waste treatment, storage, or disposal facility which either (1) has received a permit (or interim status) in accordance with the requirements of Tenn. Comp. R. & Regs. 0400-12-01-.07 [40 C.F.R. Part 270]; or (2) has received a permit (or interim status) from a State authorized in accordance with 40 C.F.R. Part 271; or (3) is a facility that recycles recyclable materials without storing them before they are recycled, as specified in Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3(ii) [40 C.F.R. § 261.6(c)(2)]; or (4) is a facility that recycles recyclable materials for precious metals recovery, as specified in Tenn. Comp. R. & Regs. 0400-12-01-.09(6) [40 C.F.R. Part 266, Subpart F]; and (5) has been designated on the hazardous waste manifest by the generator pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(3)(a) [40 C.F.R. § 262.20]. Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

31.     A "hazardous waste management unit" is defined as "a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area." Tenn. Comp. R. & Regs. 0400-12-01-.02(a) [40 C.F.R. § 260.10]. "Examples of hazardous waste management units include a surface impoundment, a waste pile, a land treatment area, a landfill cell, an incinerator, a tank and its associated piping and underlying containment system, and a container storage area." *Id.* "A

9

container alone does not constitute a unit; the unit includes containers and the land or pad upon which they are placed." *Id.*

32.     Any facility involved in the treatment, storage, or disposal of hazardous waste must obtain a permit or have achieved interim status. Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)]; Tenn. Comp. R. & Regs. 0400-12-01-.06 [40 C.F.R. Part 264]; *see also* Tenn. Comp. R. & Regs. 0400-12-01-.07(1)(b)2 [40 C.F.R. § 270.1(c)]. Facility owners and operators with interim status must comply with interim status standards set forth in Tenn. Comp. R. & Regs. 0400-12-01-.05 [40 C.F.R. § 265 Subpart A]. Tenn. Comp. R. & Regs. 0400-12-01-.06(1)(c) [40 C.F.R. § 264.3].

33.     Additionally, pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.07(1)(b)2 [40 C.F.R. § 270.1(c)], "[o]wners and operators of hazardous waste management units must have permits during the active life (including the closure period) of the unit."

34.     A facility that treats, stores, or disposes of hazardous waste must comply with numerous requirements, including the minimum acceptable national standards for the management of hazardous waste as set out in Tenn. Comp. R. & Regs. 0400-12-01-.06 [40 C.F.R. Part 264], except as specifically provided otherwise in Tenn. Comp. R. & Regs. 0400-12-01-.02 [40 C.F.R. Part 261], or as otherwise exempted by Tenn. Comp. R. & Regs. 0400-12-01-.06 [40 C.F.R. Part 264]. Such standards include requirements for facility and container management, operation, maintenance, closure, leak and spill preparedness and prevention, emergency procedures, personnel training, recordkeeping and reporting, groundwater monitoring, and the requirement to secure financial assurance for closure of the facility. Tenn. Comp. R. & Regs. 0400-12-01-.06 and 0400-12-01-.05 [40 C.F.R. Parts 264 and 265].

35.     Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.05(3)(b) [40 C.F.R. § 265.31], a LQG must maintain and operate its facility "to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment."

36.     Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. §§ 260.10 and 270.2] "treatment" is defined as

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.

37.     "Treatment" includes "recycling," as that term is defined by Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(a)3(vii) [40 C.F.R. § 261.1(c)(7)], *i.e.*, the material is "used, reused, or reclaimed," because the process of "recycling" falls within the rubric of the definition of "treatment." *Id.* A material is "reclaimed" if "it is processed to recover a usable product, or if it is regenerated." Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(a)3(iv) [40 C.F.R. § 261.1(c)(4)].

38.     "Storage" is defined as "the containment of hazardous waste in such a manner as to not constitute disposal of such hazardous waste." Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a). *See also* 40 C.F.R. §§ 260.10 and 270.2 ("Storage means the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere").

39.     "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land, water or air so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air

11

or discharged into any waters, including ground waters." Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. §§ 260.10 and 270.2].

### 4. Recycling of Hazardous Waste

40.     To encourage recycling, the recycling process itself is exempt from most permitting requirements. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3(i)-(ii) [40 C.F.R. §§ 261.6(c)(1)-(2)]. However, certain activities are still subject to permitting requirements. *Id.*

41.     Hazardous wastes that are recycled are known as "recyclable materials." Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)1(i) [40 C.F.R. § 261.6(a)(1)].

42.     Owners and operators of facilities that recycle recyclable materials without storing them before they are recycled are required only to (i) notify the Director of the Division of Solid Waste Management of the recycling activities under Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3 [RCRA Section 3010, 42 U.S.C. § 6930], (ii) comply with Tenn. Comp. R. & Regs. 0400-12-01-.05(5)(b) and (c) [40 C.F.R. §§ 264.71 and 265.72 (dealing with the use of manifest and manifest discrepancies)], and (iii) comply with Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)4 [40 C.F.R. § 261.6(d)] (regarding facilities subject to permitting requirements). However, pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)1(ii) [40 C.F.R. § 261.6(a)(2)], recyclable materials used in a manner constituting disposal are not subject to the requirements for recyclable materials, and are instead regulated under paragraphs (3), (6), (7), (8), (13), and (14) of Tenn. Comp. R. & Regs. 0400-12-01-.09 and all applicable provisions in Tenn. Comp. R. & Regs. 0400-12-01-.07 and .10 [Part 266, subpart C, and all applicable provisions in parts 268, 270, and 124].

43.     Owners and operators of facilities that store recyclable materials onsite before initiating the recycling process must comply with the permitting requirements outlined in Tenn.

Comp. R. & Regs. 0400-12-01-.07 [40 C.F.R. Part 270] and most of the standards imposed upon owners and operators of hazardous waste treatment, storage, or disposal facilities for storage of the materials before the recycling process has begun, even though the recycling process itself is exempt from regulation. Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3(i) [40 C.F.R. § 261.6(c)(1)].

44. Materials that are reclaimed from solid wastes and that are used beneficially are not deemed solid wastes, and hence are not hazardous wastes, unless the reclaimed material is used in a manner constituting disposal. Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(c)3(ii)(I) [40 C.F.R. § 261.3(c)(2)(i)].

45. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.01(4)(b)3 [40 C.F.R. § 260.30(c)], "reclaimed materials," as described in Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(c)3(ii)(I) [40 C.F.R. § 261.3(c)(2)(i)], which must be reclaimed further before recovery is completed (*i.e.*, hazardous waste derived materials that are partially reclaimed, such as partially reclaimed crude zinc oxide) continue to be hazardous wastes unless granted a variance from the definition of solid waste.

### 5. *Land Disposal of Hazardous Waste*

46. Hazardous waste derived secondary materials that are also products produced for the general public's use and that are used in a manner that constitutes disposal and that contain recyclable materials (*i.e.*, IRM) are not subject to regulation so long as these materials have undergone a chemical reaction in the course of producing them so that their constituents become inseparable by physical means, and these secondary materials meet the applicable treatment standards in Tenn. Comp. R. & Regs. 0400-12-01-.10(3) [40 C.F.R. Part 268, subpart D] for each constituent recyclable material (*i.e.*, hazardous waste) that they contain.

47.     Hazardous waste derived secondary materials must adhere to strict land disposal restrictions ("LDR") to ensure that these wastes are treated to reduce the toxicity and/or mobility of their underlying hazardous constituents to protect human health and the environment prior to being disposed of on the ground. *See* Tenn. Comp. R. & Regs. 0400-12-01-.10 [40 C.F.R. Part 268]. LDR treatment standards have been established for each hazardous waste code, and only hazardous wastes meeting LDR treatment standards may be land disposed.

48.     "Land disposal" is defined as "placement in or on the land, except in a corrective action management unit or staging pile, and includes, but is not limited to, placement in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, underground mine or cave, or placement in a concrete vault, or bunker intended for disposal purposes." Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(b)6 [40 C.F.R. § 268.2(c)].

49.     Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(i) [40 C.F.R. § 268.7(a)(1)], generators of hazardous wastes (and hazardous waste derived secondary materials) that will be land applied must determine if the waste must be treated before it can be land disposed.

50.     Certain wastes which are identified as prohibited wastes, including EAF Dust, may only be land disposed if they meet the appropriate LDR treatment standards specified in the table entitled "Treatment Standards for Hazardous Wastes," found in Tenn. Comp. R. & Regs. 0400-12-01-.10 [40 C.F.R. § 268.40]. *See* Tenn. Comp. R. & Regs. 0400-12-01-.10(3)(a)1 [40 C.F.R. § 268.40(a)]. These treatment standards govern the concentration of certain regulated hazardous constituents such as cadmium, lead, and zinc. In order to be land disposed or used in a manner constituting disposal, EAF Dust, or materials derived from EAF Dust, must be treated to

14

levels below the LDR treatment standards specified in the "Treatment Standards for Hazardous Wastes" table in Tenn. Comp. R. & Regs. 0400-12-01-.10 [40 C.F.R. § 268.40].

51.     Generators of hazardous waste (including hazardous waste derived secondary materials and EAF Dust) are also required to comply with certain LDR record keeping requirements including, but not limited to, retaining LDR notices, certifications, and waste analysis data for a minimum of three (3) years. *See* Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(viii) [40 C.F.R. § 268.7(a)(8)]. Specifically, Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(viii) provides that:

> Generators must retain on-site a copy of all notices, certifications, waste analysis data, and other documentation produced pursuant to this subparagraph for at least three years from the date that the waste that is the subject of such documentation was last sent to on-site or off-site treatment, storage, or disposal. . . . The requirements of this subpart apply to solid wastes even when the hazardous characteristic is removed prior to disposal, or when the waste is excluded from the definition of hazardous or solid waste under Rule 0400-12-01-.02(1)(b) through (f), or exempted from regulation under the Act, subsequent to the point of generation.

### 6.     *Surface Impoundments of Hazardous Waste*

52.     A "surface impoundment" or "impoundment" is defined as "a facility or part of a facility which is a natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials), which is designed to hold an accumulation of liquid wastes or wastes containing free liquids, and which is not an injection well," such as a pond. Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

53.     Placement of hazardous waste in a surface impoundment constitutes "land disposal," within the meaning of Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(b)6 [40 C.F.R. § 268.2(c)].

15

54.     In addition to the requirement that owners and operators of hazardous waste management units must have permits during the active life and closure period of the unit, there are additional requirements for surface impoundments. *See* Tenn. Comp. R. & Regs. 0400-12-01-.07(1)(b)2 [40 C.F.R. § 270.1(c)]; Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K]. These additional requirements ensure that owners and operators of surface impoundments design, construct, operate, and close the surface impoundments in a protective manner. *See* Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K].

### 7.     *Storage of Hazardous Waste*

55.     A generator who accumulates waste on-site for more than ninety (90) days is considered an operator of a storage facility and is subject to the requirements of Tenn. Comp. R. & Regs. 0400-12-01-.06 [40 C.F.R. Part 264] and 0400-12-01-.05 [40 C.F.R. Part 265] for the management, treatment, storage, and disposal of hazardous waste, and the permit requirements of Tenn. Comp. R. & Regs. 0400-12-01-.07 [40 C.F.R. Part 270], unless the generator has been granted an extension pursuant to Tenn. Comp. R. & Regs 0400-12-01-.03(4)(e)3 [40 C.F.R. § 262.34(b)] or qualifies for exemption from the requirement to obtain a permit.

56.     A generator that accumulates more than 1,000 kilograms of hazardous waste in a calendar month is a LQG. *See* Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)3 [40 C.F.R. § 262.34(b) (effective June 16, 2010 through May 29, 2017)]; *see also* 40 C.F.R. § 262.17 (effective May 30, 2017). In general, a LQG must have a permit or interim status to accumulate hazardous waste on-site. However, a LQG may qualify for a permit exemption to allow it to generate or accumulate more than 1,000 kilograms of hazardous waste in a calendar month and store the waste on-site for up to ninety (90) days without obtaining a permit or interim status, provided the generator complies with certain conditions outlined in Tenn. Comp. R. & Regs.

0400-12-01-.03(4)(e)2 [40 C.F.R. § 262.34(a) (effective June 16, 2010 through May 29, 2017)] (hereinafter referred to as the "LQG Permit Exemption").

57. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iii) [40 C.F.R. § 262.34(a)(3) (effective June 16, 2010 through May 29, 2017)], which is a condition of the LQG Permit Exemption, a generator is required to label or clearly mark each container and tank accumulating hazardous waste on-site with the words: "Hazardous Waste." *See also* 40 C.F.R. § 262.17(a)(5).

58. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(ii) [40 C.F.R. § 262.34(a)(2) (effective June 16, 2010 through May 29, 2017)], which is a condition of the LQG Permit Exemption, a generator is required to ensure that the date upon which each period of accumulation begins is clearly marked and visible on each container. *See also* 40 C.F.R. § 262.17(a)(5).

59. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iv) [40 C.F.R. § 262.34(a)(4) (effective June 16, 2010 through May 29, 2017)], which incorporates Tenn. Comp. R. & Regs. 0400-12-01-.05(3)(b) [40 C.F.R. § 265.31], and is a condition of the LQG Permit Exemption, a generator is required to maintain and operate its facility to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.

60. A "container," as defined in Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10], means "any portable device in which a material is stored, transported, treated, disposed of, or otherwise handled."

17

61.     For purposes of this provision, the term "accumulate" refers to "both the storage and treatment of hazardous wastes generated on-site." *See* Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)1.

**B.     Legal Remedies**

62.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), authorizes the Administrator of EPA to commence a civil action for appropriate relief when any person is in violation of Subtitle C of RCRA. The THWMA, Tenn. Code Ann. 68-212-101 *et seq.*, authorizes the Commissioner of TDEC to commence a civil action for appropriate relief when any person is in violation of the THWMA.

63.     Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act of 2015, 28 U.S.C. § 2461 note: Pub. L. 114-74, Section 701, and 40 C.F.R. § 19.4, provide that any person who violates any requirement of Subtitle C of RCRA shall be liable to the United States for a civil penalty of up to $37,500 per violation for each violation between January 12, 2009 and November 2, 2015, and $70,117 for each violation thereafter. Each day of such violation constitutes a separate violation.

64.     Tenn. Code Ann. § 68-212-114(b)(1) provides that any person who violates any provision of the THWMA, or regulations thereunder, shall be liable to the State of Tennessee for a civil penalty of up to $50,000 per day for each day of violation. Each day of such violation constitutes a separate violation.

18

## FACTUAL ALLEGATIONS

### A.   General Background of the Rockwood Facility

65.     Defendant's Rockwood Facility is located at 199 Truck Route, Rockwood, Roane

County, Tennessee, and encompasses approximately 45 acres of a 101-acre property owned by

Defendant. The Facility consists of production areas, including two Waelz Kilns, one coke

storage pile, storage piles for IRM, a storage building for crude zinc oxide ("CZO"), railcar

loading/unloading areas, warehouses, offices, laboratories, and the Moon Springs Pond, which is

unlined, and which is located on the eastern portion of the property. The Rockwood Facility is

surrounded by both residential, commercial, and industrial areas.

66.     Defendant attained control of the Rockwood Facility in 2003, and has since been

operating it as an EAF Dust recycling facility.

### B.   Overview of the Zinc Recycling Process at the Rockwood Facility

67.     At the Rockwood Facility, Defendant processes EAF Dust that is generated by

steel mills in order to recover zinc content from the material. At the steel mills which generate

EAF Dust, the EAF Dust is collected by emission control devices when steel is manufactured.

EAF Dust forms as result of volatile metals, such as zinc and lead, passing into the vapor phase

at the operating temperature of the electric arc furnace and being oxidized and cooled in the

extractive air flow.

68.     EAF Dust is listed as a hazardous waste, carrying the code K061, because it

contains water leachable heavy metals and is toxic for hexavalent chromium, lead, and cadmium.

Tenn. Comp. R. & Regs. 0400-12-01-.02(4)(c) & 0400-12-01-.02(30)(App. VII) [40 C.F.R. §

261.32 and Part 261, App. VII]. As a listed hazardous waste, EAF Dust must be handled and

disposed of consistent with RCRA requirements.

19

69.     Defendant recovers zinc from EAF Dust by subjecting EAF Dust to high temperature metal recovery ("HTMR"). The HTMR process generally involves metering (*i.e.*, measuring) the EAF Dust, adding moisture (*e.g.*, water) and blending a carbon additive (*e.g.*, coke) to the EAF Dust, curing the mixture, pressing the blend into pellets, and then feeding the mixture into a Waelz rotary kiln ("Waelz Kiln") where it is dried, preheated, and reacted. The process produces outputs: volatilized metals in gaseous form, and a heavier particle output.

70.     The lighter weight volatilized metals (*i.e.*, zinc oxide gas and volatilized cadmium and lead) exit the kiln into a settling chamber and are sprayed with water to recapture and re-feed any dust particles back into the kiln. The zinc oxide gas then leaves the settling chamber and enters the product baghouse, where it condenses and is captured in a solid form known as CZO. The CZO is then shipped offsite to different facilities for further processing to recover zinc metal and zinc oxide.

71.     The heavier particle output from the HTMR process is a hazardous waste derived secondary material in the form of a rock-like slag known as iron rich materials ("IRM"). IRM consists primarily of iron, iron oxides, lime, and silica. This material exits the kiln at a very high temperature, is separated into two size fractions and is fed through a chiller to cool it. Defendant typically sells the IRM it produces to asphalt and cement companies to use as road base. Because the IRM is used in a manner constituting disposal, pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.09(3) [40 C.F.R. § 266.20(b)], Defendant is required to test the IRM prior to placement on land and confirm that it meets the applicable land disposal standards for EAF Dust as set forth in Tenn. Comp. R. & Regs. 0400-12-01-.10(2)(c) [40 C.F.R. § 268.40].

20

## C.     Rockwood Facility Operations

72.     EAF Dust is sent from various steel manufacturers to the Rockwood Facility via hopper railcars, pressure differential railcars, and covered trucks.

73.     The EAF Dust is emptied into the Railcar Unloading Building and then transferred via conveyor belt to the Curing and Blending Building ("C&B Building"); unloaded directly into the C&B Building; or unloaded into metering bins. EAF Dust from the C&B Building and the metering bins is transferred to the Feed Building prior to entering one of two Waelz Kilns, where CZO and IRM are produced.

74.     The Railcar Unloading Building, C&B Building, metering bins, and Feed Building are "hazardous waste management units," as defined in Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10]. However, per Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3(i)-(ii) [40 C.F.R. §§ 261.6(c)(1)-(2)], so long as no storage of hazardous waste occurs in these units, the recycling processes that occur in these units is exempt from permitting requirements.

75.     The two Waelz Kilns are "hazardous waste management units." *See* Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10]. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)3(i)-(ii) [40 C.F.R. §§ 261.6(c)(1)-(2)], so long as the Waelz Kilns are engaged in "recycling" activities (*see, e.g.*, Tenn. Comp. R. & Regs. 0400-12-01-.09(8)(a)4 [40 C.F.R. § 266.100, Subpart H]), they are permit exempt "hazardous waste management units."

76.     The CZO generated by processing EAF Dust in the Waelz Kiln is collected in a CZO Product Collector, then transferred to railcars for offsite shipment to other facilities which further process it to produce zinc metal and higher-grade zinc oxide.

77.     The IRM generated by processing EAF dust in the Waelz Kiln is a recyclable material used in a manner constituting disposal, and therefore is a hazardous solid waste subject to regulation, until the material meets the applicable treatment standards in Tenn. Comp. R. & Regs. 0400-12-01-.10(2)(c) [40 C.F.R. § 268.40].

78.     Upon exiting the Waelz Kiln, the IRM is transported to the facility's IRM Building via a series of conveyor belts.

79.     As the IRM is transported on the conveyor belts from the Waelz Kilns to the IRM Building, small amounts of IRM are released and captured in bins (hereafter "Chiller Bins"). Once a Chiller Bin is full, the IRM it contains is transported to the IRM Building via a skid steer loader. The IRM from the conveyor belts and the Chiller Bins is then stockpiled in the IRM Building. The conveyor belts transferring IRM (including the land that these belts are on), the Chiller Bins (and the concrete pads these are located on) storing IRM, and the IRM Building are "hazardous waste management units." *See* Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

80.     In the IRM Building, Defendant then tests the IRM using the RCRA Toxicity Characteristic Leaching Procedure ("TCLP") and holds the IRM in the IRM Building until the analysis comes back. If the analysis demonstrates that the IRM is below the applicable RCRA LDR treatment standards, the IRM is no longer subject to regulation, and it is then stored in piles outside on the ground in various designated IRM storage locations situated throughout the facility.

81.     The piles of IRM (including the ground on which they are located) are "hazardous waste management units" pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R.

§ 260.10], unless the IRM meets the applicable RCRA LDR treatment standards set forth in Tenn. Comp. R. & Regs. 0400-12-01-.10(3) [40 C.F.R. Part 268, Subpart D].

82. If the IRM does not meet the applicable RCRA LDR treatment standards, the IRM continues to be subject to regulation. Defendant's standard procedure at the Rockwood Facility is to send the failing IRM back through the Waelz Kiln for further treatment and testing, until the LDR treatment standards are not exceeded.

83. All stormwater runoff from the Rockwood Facility is drained into ditches that discharge into the Moon Springs Pond, causing the introduction of EAF Dust and/or in-process IRM, *i.e.*, IRM which has not yet been tested to determine whether it meets the RCRA LDR treatment standards and/or has been tested and has failed to meet RCRA LDR treatment standards, into Mood Springs Pond and the ditches that drain into it.

84. Moon Springs Pond and the ditches that drain into it are "surface impoundments" and "hazardous waste management units," as defined in Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

85. At the Rockwood Facility, Defendant employs vacuum trucks to collect releases of EAF Dust from the recycling processes. The vacuum trucks are operated by a contractor for Defendant. Malfunctions with the vacuum trucks causing releases of EAF Dust appear to be common, and during the relevant time period, Defendant had no formal procedure in place to prevent these malfunctions or to recover the released EAF Dust.

**D.** **Rockwood Facility Regulatory Background**

86. During normal operations, the Rockwood Facility is a CESQG of hazardous waste. However, the Rockwood Facility periodically cleans out its Waelz Kilns. The materials removed during the cleanouts are a combination of EAF Dust, coke, and partially processed IRM

(*i.e.*, "in-process IRM"). These materials are hazardous wastes and must be counted towards the Rockwood Facility's generator status. During these cleanouts, the Rockwood Facility generates more than 1,000 kilograms of hazardous waste and, therefore, qualifies as a LQG and is subject to the LQG requirements for permitting and storage, which allow storage of hazardous wastes on-site for no more than ninety days without a permit, but require the containers containing these wastes to be clearly labeled "Hazardous Waste" and marked with the date on which accumulation of the wastes began.

87.     The Rockwood Facility has been assigned EPA Generator Identification Number TND 982-144-099.

88.     At all times relevant to the filing of this Complaint, the Rockwood Facility did not have a permit or interim status to store hazardous waste.

89.     On April 16, 2013, EPA issued an Administrative Order on Consent (hereafter "EPA Administrative Order") under Section 3013(a) of RCRA, 42 U.S.C. § 6934(a), determining that the presence and/or release of hazardous waste, as defined in Section 1004(5) of RCRA, at the Rockwood Facility may present a substantial hazard to human health or the environment, and requiring Defendant to conduct monitoring, testing, analysis, and reporting to ascertain the nature and extent of such hazard.

90.     On or about January 28, 2015, TDEC received from Defendant a RCRA Hazardous Waste Part A permit application for the Rockwood Facility, which is a prerequisite for submitting a Part B Permit Application. Subsequently, on May 28, 2015, TDEC and Defendant entered a Consent Order (Consent Order No. HWM14-0024) (hereafter "Tenn. Consent Order") with respect to the storage and management of railcars containing EAF Dust at the Rockwood Facility pending issuance of the hazardous waste permit by TDEC. The Tenn.

24

Consent Order requires Defendant to submit an Interim Operations Plan ("IOP") for the railcar storage area to TDEC, and submit a Part B hazardous waste storage application for the storage of EAF dust in railcars pending its introduction to the recycling process. Defendant submitted its IOP to TDEC on July 17, 2015; Defendant submitted a revised IOP on November 17, 2015; and Defendant submitted a Part B Permit Application on October 2, 2015. On January 6, 2016, TDEC approved the IOP. Per the Tenn. Consent Order, Defendant is required to manage the EAF Dust in the container storage area in accordance with the IOP until a final permit is issued to the Rockwood Facility by TDEC.

91.     On April 23, 2019, TDEC conducted a public meeting to receive comments on the proposal to issue a hazardous waste storage permit to Defendant for the Rockwood Facility. The public review and comment period concluded May 6, 2019. On September 24, 2019, TDEC issued Defendant a hazardous waste storage permit, valid for 10 years, that includes standard and general facility conditions, and specific conditions for storage in containers and for corrective action, including financial assurance for closure.

92.     The Rockwood Facility obtained a variance from TDEC for CZO to exempt it from the definition of solid waste on several occasions. Most recently on April 24, 2020, TDEC approved a variance renewal valid for ten (10) years, imposing management, storage, and recordkeeping conditions on partially reclaimed CZO generated at the Rockwood Facility.

**E.     Factual Bases for Alleged RCRA Violations at the Rockwood Facility**

93.     The Rockwood Facility has been inspected by either EPA or TDEC for compliance with hazardous waste regulations at least 24 times since it began operation in 1990. The alleged violations described below were identified during two inspections conducted by EPA and TDEC on July 27, 2010 (hereafter "July 2010 Inspection") and on March 14-15, 2011

(hereafter "March 2011 Inspection"). The results of EPA's inspections were set forth in a RCRA Compliance Evaluation Inspection Report dated June 14, 2012.

94. During the March 2011 Inspection, EPA and TDEC observed thirteen railcars containing EAF Dust located at the Rockwood Facility. As indicated on the below table, at the time of inspection, between four (4) and twelve (12) days had passed since ten (10) of the railcars first arrived at the Rockwood Facility.

| Railcar ID Number | Date Manifest Signed | Amount of EAF Dust | Number of Days Onsite (as of March 14, 2011) |
|---|---|---|---|
| IFRX 153085 | March 2, 2011 | 158,000 lbs. | 12 |
| ACFX 27348 | March 4, 2011 | 198,000 lbs. | 10 |
| RRLX 5993 | March 4, 2011 | 156,750 lbs. | 10 |
| INTX 4009 | March 4, 2011 | 197,000 lbs. | 10 |
| MXCX 400007 | March 7, 2011 | 195,000 lbs. | 7 |
| ACFX 49450 | March 7, 2011 | 196,000 lbs. | 7 |
| IFRX 153156 | March 9, 2011 | 119,000 lbs. | 5 |
| SMIX 2041 | March 9, 2011 | 176,800 lbs. | 5 |
| IFRX 153105 | March 10, 2011 | 179,400 lbs. | 4 |
| INTX 4018 | March 10, 2011 | 197,850 lbs. | 4 |

95. During both the July 2010 and March 2011 Inspections, EPA and TDEC observed numerous discharge points where EAF Dust was being released into the environment, and they observed reddish-brown dust consistent with EAF Dust on the ground throughout the Rockwood Facility. These releases of EAF Dust resulted from defects in the buildings and conveyor belts at the Rockwood Facility. The EAF Dust released from the buildings and conveyor belts accumulated on the ground, in a nearby drainage ditch, and in Moon Springs Pond.

96. During the July 2010 and March 2011 Inspections, EPA and TDEC observed what appeared to be EAF Dust accumulating on the ground, concrete, and grassy areas surrounding the lower level of the Railcar Unloading Building. The Railcar Unloading Building appeared in disrepair; metal sheeting was pulled back from the building, exposing the building's

contents directly into the environment, and the building's door was rotted and unable to be closed. Additionally, EPA and TDEC observed accumulations of EAF Dust on the ground around a conveyor belt adjacent to the building. Soil samples taken from areas around the building tested above LDR treatment standards for cadmium and zinc. One sample also tested above LDR treatment standards for lead.

97.      During the July 2010 and March 2011 Inspections, EPA and TDEC observed two concrete flumes draining the area around the Railcar Unloading Building and discharging on the bank of Moon Springs Pond, which was unlined. During both inspections, EPA and TDEC observed runoff contaminated with EAF Dust flowing from the Railcar Unloading Building into the concrete flumes and into grassy areas and ditches around the building. The concrete surrounding the Railcar Unloading Building was stained reddish-black, and nearby puddles contained residue consistent with EAF Dust. Soil samples contained high levels of cadmium, lead, and zinc. A sediment sample taken from a weir in one of the concrete flumes approximately ten (10) feet from where the flume discharges into Moon Springs Pond tested above the LDR treatment standards for cadmium, lead, and zinc.

98.      Moon Springs Pond was not lined, did not have a leachate collection and removal system, did not have a leak detection system, and had not undergone the proper construction quality assurance required for hazardous waste surface impoundments.

99.      During both the July 2010 and March 2011 Inspections, EPA and/or TDEC observed piles of EAF Dust on the ground exiting the conveyor belt system outside the C&B Building. The location of the piles and the reddish-brown stain on the exterior of the enclosed conveyor belt system highlight flaws in the conveyor belt system that allowed EAF Dust to be directly released onto the ground outside the C&B Building. Soil samples revealed the presence

27

of cadmium, lead, and zinc at levels above what are permissible under RCRA LDR treatment standards.

100.　During both the July 2010 and March 2011 Inspections, EPA and/or TDEC observed piles of IRM on the ground underneath the conveyor belts which transported in-process IRM from the Waelz Kilns to the IRM Building. The locations of the piles of IRM indicated that gaps in the conveyor system allowed untested IRM to be deposited directly onto the ground. Additionally, the conveyor belts were in disrepair, with noticeable dents and holes in the covers, allowing in-process IRM to escape into the environment.

101.　During both the July 2010 and March 2011 Inspections, EPA and TDEC observed that all four Chiller Bins observed on-site were three-sided concrete boxes on concrete bases and open to the environment. In-process IRM was observed in the Chiller Bins and on the ground surrounding the Chiller Bins. This in-process IRM appeared to have escaped these Chiller Bins onto the ground both by storm water runoff and by being tracked out of these Chiller Bins by the wheels of the skid steer loaders which are used to move in-process IRM from these bins to the IRM Building.

102.　During both the July 2010 and March 2011 Inspections, EPA and TDEC observed in-process IRM on the ground surrounding the IRM Building, which was most prevalent in openings of the building (*e.g.*, bay doors, pedestrian doors, and holes in exterior walls which appeared deteriorated and lacking proper maintenance). The accumulation of IRM outside the IRM Building indicates that the building was not preventing untested IRM from escaping into the environment. A soil sample taken from the area outside the IRM Building exceeded RCRA LDR treatment standards for zinc.

103. During the July 2010 Inspection, EPA and TDEC observed a vacuum truck expelling EAF Dust directly into the air and soil outside the Rockwood Facility's Hopper Unloading Building. Malfunctions with the vacuum trucks causing releases of EAF Dust appeared to be common. Furthermore, during the relevant time period, there was no procedure in place to prevent these malfunctions or to recover the released EAF Dust.

104. During the March 2011 Inspection, EPA and TDEC observed two 40 cubic yard roll-off containers located in the Rockwood Facility's designated waste storage area near the Railcar Unloading Building. The roll-off containers contained various EAF Dust contaminated wastes, including waste tubes, pipes, and trash. The roll-off containers were both closed, but neither was labeled "Hazardous Waste" or dated with the accumulation start date.

105. On October 8, 2013, TDEC inspected the Facility and observed several equipment improvements including, *inter alia*, conveyor system improvements; a new vacuum truck contractor; improvements to the EAF dust handling system and storage building; universal waste containers and tanks were properly labeled and dated; an exposed IRM collection pad was removed; and improved sampling and analysis protocols. TDEC also observed that the EAF Dust spill residue that was present at the July 2010 and March 2011 inspections was no longer present.

### FIRST CLAIM FOR RELIEF

**(Operating a Hazardous Waste Storage Facility Without a Permit or Interim Status, in Violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)] and Tenn. Comp. R. & Regs. 0400-12-01-.06, .05, and .07 [40 C.F.R. Parts 264, 265, and 270])**

106. The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

107. Pursuant to Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)] and Tenn. Comp. R. & Regs. 0400-12-01-.06 and .05 [40 C.F.R. Parts

264 and 265], an owner or operator of a designated facility which recycles recyclable materials is prohibited from storing these materials without having a permit or interim status to store hazardous waste. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.07 [40 C.F.R. Part 270], a permit is required for the treatment, storage, and disposal of any hazardous waste.

108. The Rockwood Facility "recycles" EAF Dust, a "recyclable material," to recover iron, zinc, calcium, lead, and cadmium by using the rotary Waelz Kiln process. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(a)3(vii) [40 C.F.R. § 261.1(c)(7)] & Tenn. Comp. R. & Regs. 0400-12-01-.02(1)(f)1(i) [40 C.F.R. § 261.6(a)(1)].

109. As such, the Rockwood Facility is engaged in the "treatment" of "hazardous waste." *See* Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. §§ 260.10 and 270.2].

110. During the March 2011 Inspection, EPA and TDEC observed Defendant storing at least 1,773,800 lbs. (887 tons) of EAF Dust on rail cars located on the Rockwood Facility's rail spurs for several days prior to unloading the EAF Dust for recycling.

111. At all times relevant to the filing of this Complaint, Defendant had neither a RCRA hazardous waste permit nor interim status for storage of hazardous waste at the Rockwood Facility, and is therefore in violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA Sections 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)], and the applicable regulatory requirements found at Tenn. Comp. R. & Regs. 0400-12-01-.06, .05, and .07 [40 C.F.R. Parts 264, 265, and 270].

112. Each day that Defendant continued to store EAF Dust on railcars at its Rockwood Facility constitutes a separate violation of THWMA and its applicable regulations.

113. Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

## SECOND CLAIM FOR RELIEF

**(Operating a Hazardous Waste Management Unit Without a Permit or Interim Status, in Violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)] and Tenn. Comp. R. & Regs. 0400-12-01-.06, .05, and .07 [40 C.F.R. Parts 264, 265, and 270])**

114.    The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

115.    Pursuant to Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)] and Tenn. Comp. R. & Regs. 0400-12-01-.06, 05, and .07 [40 C.F.R. Parts 264, 265, and 270], a permit or interim status is required for the treatment, storage, or disposal of hazardous waste, and owners and operators of hazardous waste management units must have permits during the active life of the unit.

116.    EAF Dust was present in accumulations on the ground, concrete, and grassy areas surrounding the lower level of the Railcar Unloading Building, on the ground around a conveyor belt adjacent to the Railcar Unloading Building, on the ground below the existing conveyor belt system surrounding the C&B Building, and a vacuum truck was expelling EAF Dust directly into the air and onto the ground. Additionally, in-process IRM was present on the ground surrounding the IRM building, in the Chiller Bins and on the ground surrounding the Chiller Bins.

117.    The ground, concrete, and grassy areas surrounding the lower level of the Railcar Unloading Building; the ground around the conveyor belt adjacent to the Railcar Unloading Building; the Chiller Bins, including the concrete pads on which they are located; and the ground surrounding the vacuum truck at the time it was expelling EAF Dust into the air are all "hazardous waste management units," as defined by Tenn. Comp. R. & Regs. 0400-12-01-.02(a) [40 C.F.R. § 260.10].

118. At all times relevant to the filing of this Complaint, Defendant had neither a RCRA hazardous waste permit nor interim status for these hazardous waste management units, and is therefore in violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA Sections 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)], and the applicable regulatory requirements found at Tenn. Comp. R. & Regs. 0400-12-01-.06, .05 and .07 [40 C.F.R. Parts 264, 265, and 270].

119. Each day that Defendant continued to operate these hazardous waste management units at its Rockwood Facility without a permit or interim status constitutes a separate violation of THWMA and its applicable regulations.

120. Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

### THIRD CLAIM FOR RELIEF

**(Land Disposal of a Hazardous Waste Without Determining if the Waste Must be Treated, in Violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(i) [40 C.F.R. § 268.7(a)(1)]; Without Treatment of the Waste to Meet Applicable LDR Treatment Standards, in Violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(3)(a)1 [40 C.F.R. § 268.40(a)]; and Without Complying with the Applicable LDR Record Keeping Requirements, in Violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(viii) [40 C.F.R. § 268.7(a)(8)])**

121. The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

122. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(i) [40 C.F.R. § 268.7(a)(1), "[a] generator of hazardous waste must determine if the waste has to be treated before it can be land disposed."

123. EAF Dust is a hazardous waste, carrying the code K061. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(4)(c) & 0400-12-01-.02(30)(App. VII) [40 C.F.R. § 261.32 and Part 261, App. VII].

32

124.    IRM is a material derived from EAF Dust. *See* Tenn. Comp. R. & Regs. 0400-12-01-.02(c)3, 4, & 7 [40 C.F.R. §§ 261.3(c), (d), & (g)].

125.    Defendant is a "generator of hazardous waste" at the Rockwood Facility because Defendant generates materials which are wastes and which contain EAF Dust or EAF Dust constituents. *See* Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10]; Tenn. Comp. R. & Regs. 0400-12-01-.02(c)3, 4, & 7 [40 C.F.R. §§ 261.3(c), (d), & (g)].

126.    As specified in Tenn. Comp. R. & Regs. 0400-12-01-.10(3)(a)1 [40 C.F.R. § 268.40(a)], before EAF Dust or materials derived from EAF Dust can be land disposed, or used in a manner constituting disposal, it must be tested to determine whether it meets the appropriate LDR treatment standards specified in the table entitled "Treatment Standards for Hazardous Wastes," found in Tenn. Comp. R. & Regs. 0400-12-01-.10 [40 C.F.R. § 268.40].

127.    EAF Dust or materials derived from EAF Dust also must be treated to levels below the LDR treatment standards specified in the table. *See* Tenn. Comp. R. & Regs. 0400-12-01-.10(3)(a)1 [40 C.F.R. § 268.40(a)].

128.    Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(viii) [40 C.F.R. § 268.7(a)(8)], a generator of hazardous waste "must retain on-site a copy of all notices, certifications, waste analysis data, and other [required] documentation" for at least three years for all hazardous waste and materials derived from hazardous waste that is disposed of, including those "derived-from" materials from which "the hazardous characteristic is removed prior to disposal, or when the waste is excluded from the definition of hazardous or solid waste under Rule 0400-12-01-.02(1)(b) through (f), or exempted from regulation under the Act, subsequent to the point of generation."

129.     Defendant disposed of EAF Dust on the ground, concrete, and grassy areas surrounding the lower level of the Railcar Unloading Building, around a conveyor belt adjacent to the building, under the conveyor belt system outside the C&B Building, and in runoff flowing from the Railcar Unloading Building into the concrete flumes, and into grassy areas and ditches around the Railcar Unloading Building. Defendant also disposed of EAF Dust by operating a vacuum truck that was expelling EAF Dust directly into the air and onto the ground outside the Railcar Unloading Building.

130.     Defendant disposed of in-process IRM on the ground underneath the conveyor belts transporting in-process IRM from the Waelz Kilns to the IRM Building, on the ground surrounding the Chiller Bins, and on the ground surrounding the IRM Building.

131.     Samples of EAF Dust and in-process IRM taken by the EPA from the ground in the areas around the Railcar Unloading Building, one of the concrete flumes, under the conveyor belt system outside the C&B Building, and the area outside the IRM Building exhibited high concentrations of EAF Dust constituents (e.g., lead, zinc, and/or cadmium) or were determined to be above the LDR treatment standards for the constituents lead, zinc, and/or cadmium.

132.     At all times relevant to the filing of this Complaint, Defendant did not test the EAF Dust or in-process IRM to ensure that it met appropriate LDR treatment standards before disposal, and is therefore in violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(i) [40 C.F.R. § 268.7(a)(1)].

133.     At all times relevant to the filing of this Complaint, Defendant did not treat the EAF Dust or in-process IRM to ensure that it met appropriate LDR treatment standards before disposal, and is therefore in violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(3)(a)1 [40 C.F.R. § 268.40(a)].

34

134. At all times relevant to the filing of this Complaint, Defendant did not retain the appropriate records for the EAF Dust or in-process IRM disposed of, and is therefore in violation of Tenn. Comp. R. & Regs. 0400-12-01-.10(1)(g)1(viii) [40 C.F.R. § 268.7(a)(8)].

135. Each day that Defendant continued to dispose of EAF Dust and/or in-process IRM without first testing it to ensure that it meets appropriate LDR treatment standards (*i.e.*, testing) constitutes a separate violation of THWMA and its applicable regulations.

136. Each day that Defendant continued to dispose of EAF Dust and/or in-process IRM without first ensuring that it was treated to levels below the appropriate LDR treatment standards constitutes a separate violation of THWMA and its applicable regulations.

137. Each day that Defendant continued to dispose of EAF Dust and/or IRM without maintaining the appropriate records constitutes a separate violation of THWMA and its applicable regulations.

138. Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

139. U.S.C. § 6928(g) for each of these violations.

## FOURTH CLAIM FOR RELIEF

**(Operating a Surface Impoundment Without a Permit or Interim Status in Violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)]) and Tenn. Comp. R. & Regs. 0400-12-01-.06, .05, and .07 [40 C.F.R. Parts 264, 265, and 270**

140. The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

141. Pursuant to Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)] and Tenn. Comp. R. & Regs. 0400-12-01-.06 and .05 [40 C.F.R. Parts 264 and 265], an owner or operator of a facility must have a permit or interim status.

Case 3:20-cv-00379-PLR-HBG   Document 1   Filed 08/25/20   Page 35 of 43   PageID #: 35

142.    Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.07 [40 C.F.R. Part 270], a permit is required for the treatment, storage, and disposal of any hazardous waste.

143.    Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) explicitly defines "facility" to include "surface impoundments."

144.    Defendant disposed of EAF Dust and/or IRM at the Facility, which in storm water flowed through concrete flumes and/or ditches, and into Moon Springs Pond.

145.    Sediment taken from a concrete flume ten (10) feet from the flume's discharge point into Moon Springs Pond tested above LDR treatment standards for cadmium, lead, and zinc.

146.    Moon Springs Pond and its associated concrete flumes and ditches are "surface impoundments" within the meaning of Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

147.    At all times relevant to the filing of this Complaint, Defendant did not have a permit or interim status to operate a surface impoundment at the Facility, and is therefore in violation of Tenn. Code Ann. § 68-212-108(a)(1) [RCRA §§ 3005(a) and (e), 42 U.S.C. §§ 6925(a) and (e)], and the applicable regulatory requirements found at Tenn. Comp. R. & Regs. 0400-12-01-.06, .05, and .07 [40 C.F.R. Parts 264, 265, and 270].

148.    Each day that Defendant continued to operate the surface impoundments without a permit or interim status constitutes a separate violation of THWMA and its applicable regulations.

149.    Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

## FIFTH CLAIM FOR RELIEF

**(Failure to Operate a Surface Impoundment in a Protective Manner in Violation of Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K])**

150.     The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

151.     Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K] requires that the surface impoundment be designed, constructed, operated, and closed in a protective manner, to ensure that hazardous wastes are not released into the environment. Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K], a surface impoundment must be lined and/or designed and operated in a manner to prevent the migration of hazardous wastes into the ground and/or surface water. The surface impoundment must be inspected weekly and after storm events, and it must have a leak detection system to ensure that any deterioration, malfunctions, overflows, or other structural issues are identified and corrected.[1]

152.     Moon Springs Pond and its associate concrete flumes and ditches are "surface impoundments" within the meaning of Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10].

153.     At all times relevant to the filing of this Complaint, Moon Springs Pond and its associated concrete flumes and ditches were not lined, did not have a leachate collection and removal system, did not have a leak detection system, and had not undergone the proper quality assurance required for hazardous waste surface impoundments, and are therefore in violation of Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K].

---

[1] For a full list of requirements, *see* Tenn. Comp. R. & Regs. 0400-12-01-.06(11) [40 C.F.R. Part 264, Subpart K].

154. Each day that Defendant continued to operate Moon Springs Pond and its associated concrete flumes and ditches as surface impoundments without the proper protective measures as specified in the preceding paragraph constitutes a separate violation of THWMA and its applicable regulations.

155. Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

### SIXTH CLAIM FOR RELIEF

**(Failure to Label and Date Containers in the Hazardous Waste Storage Area, in Noncompliance with Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iii) [40 C.F.R. § 262.34(a)(3)] and Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(ii) [40 C.F.R. § 262.34(a)(2)], in Violation of Tenn. Code Ann. § 68-212-108(a) [RCRA §§ 3005(a) and (e)])**

156. The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

157. A LQG may store hazardous waste on-site for up to ninety (90) days without obtaining a permit or interim status, but only if the generator meets certain conditions set forth in Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2 [40 C.F.R. § 262.34(a)]. *See* Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2 & .03(4)(e)3 [40 C.F.R. §§ 262.34(a) & (d)(1)]. These conditions include labeling or clearly marking each container holding accumulated hazardous waste on-site with the words: "Hazardous Waste" and with the date upon which accumulation began *See* Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iii) [40 C.F.R. § 262.34(a)(3)] & Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(ii) [40 C.F.R. § 262.34(a)(2)].

158. During the periodic cleaning out of its Waelz Kilns, the Rockwood Facility removes the Waelz Kiln contents, which includes a combination of EAF Dust, coke, and in-process IRM. These materials are "hazardous wastes" pursuant to Tenn. Comp. R. & Regs.

38

0400-12-01-.02(4)(c) & 0400-12-01-.02(30)(App. VII) [40 C.F.R. § 261.32 and Part 261, App. VII].

159.     During the kiln cleanout process, the Rockwood Facility generates and/or accumulates more than 1,000 kilograms of these wastes and thus is a LQG and subject to the terms and conditions specified in Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e) [40 C.F.R. § 262.34 (effective June 16, 2010 to May 29, 2017)].

160.     Defendant disposed of the hazardous wastes generated and/or accumulated during its cleanout of the two Rockwood Facility's Waelz Kilns in two 40-cubic yard roll-off containers located in the Facility's designated waste storage area near the Railcar Unloading Building.

161.     These two roll-off containers are "containers" within the meaning of Tenn. Comp. R. & Regs. 0400-12-01-.01(2)(a) [40 C.F.R. § 260.10], and Defendant was "accumulating" these wastes in the roll-off containers, within the meaning of Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)1.

162.     Defendant did not label the roll-off containers with the words "Hazardous Waste."

163.     Defendant did not clearly mark and make visible the date on which the accumulation period commenced in the roll-off containers.

164.     Thus, Defendant violated Tenn. Code Ann. § 68-212-108(a) [RCRA §§ 3005(a) and (e)] by storing hazardous waste without a permit or interim status because Defendant failed to meet a condition of the LQG Permit Exemption by not complying with the labeling requirements of Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iii) [40 C.F.R. § 262.34(a)(3)] and the dating requirements of Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(ii) [40 C.F.R. § 262.34(a)(2)].

165.    Each day that Defendant continued to accumulate hazardous waste in containers that were not clearly labeled "Hazardous Waste" constitutes a separate violation of THWMA and its applicable regulations.

166.    Each day that Defendant continued to accumulate hazardous waste in containers that were not clearly marked with the date on which accumulation began constitutes a separate violation of THWMA and its applicable regulations.

167.    Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g) for each of these violations.

## SEVENTH CLAIM FOR RELIEF

**(Failure to Maintain a Treatment, Storage or Disposal Facility to Minimize the Possibility of Release of Hazardous Waste or Hazardous Constituents to the Environment, in Noncompliance with Tenn. Comp. R. & Regs. 0400-12-01-.05(3)(b)[40 C.F.R. § 265.31], in violation of Tenn. Code Ann. § 68-212-108(a) [RCRA §§ 3005(a) and (e)])**

168.    The allegations in Paragraphs 1 through 105 above are re-alleged and incorporated herein by reference.

169.    Pursuant to Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iv) [40 C.F.R. § 262.34(a)(4)], which incorporates Tenn. Comp. R. & Regs. 0400-12-01-.05(3)(b) [40 C.F.R. § 265.31], and is a condition of the LQG Permit Exemption, a generator is required to maintain and operate its facility "to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment."

170.    There have been numerous releases of both EAF Dust and in-process IRM at the Rockwood Facility, including outside the Railcar Unloading Building, the C&B Building and the IRM Building, below the conveyor belts transporting EAF Dust and in-process IRM between

40

buildings, outside the Chiller Bins, in and near concrete flumes running to Moon Springs Pond, and from a vacuum truck in front of the Railcar Unloading Building.

171.    These releases were due to building defects, flaws in the conveyor belts and noticeable disrepair of the buildings and conveyor belts, as well as the lack of procedures in place to prevent releases, including vacuum truck malfunctions causing releases of EAF Dust at the Defendant's Facility.

172.    Therefore, Defendant violated Tenn. Code Ann. § 68-212-108(a) [RCRA §§ 3005(a) and (e)] by storing hazardous waste without a permit or interim status because Defendant failed to meet a condition of the LQG Permit Exemption set forth in Tenn. Comp. R. & Regs. 0400-12-01-.03(4)(e)2(iv) [40 C.F.R. § 262.34(a)(4)], by failing to comply with the maintenance and operation requirements of Tenn. Comp. R. & Regs. 0400-12-01-.05(3)(b) [40 C.F.R. § 265.31].

173.    Each day of Defendant's continued failure to maintain and operate the Rockwood Facility in a manner to "minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water" constitutes a separate violation of the THWMA and its applicable regulations.

174.    Defendant is liable for civil penalties pursuant to RCRA Section 3008(g), 42 U.S.C. § 6928(g), for each of these violations.

<u>**PRAYER FOR RELIEF**</u>

Wherefore, Plaintiffs, the United States of America and the State of Tennessee, respectfully request that this Court:

a.      Enter judgment in favor of Plaintiffs, the United States and the State of Tennessee, and against Defendant American Zinc Recycling Corp., f/k/a Horsehead Corporation;

c.	Assess civil penalties against Defendant for each of the violations alleged herein;

d.	Award Plaintiffs their costs and disbursements in this action;

e.	Grant such other further relief as this Court may deem just and proper.

Respectfully submitted,

**ATTORNEYS FOR UNITED STATES OF AMERICA:**

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

_s/ Rachael Amy Kamons_
RACHAEL AMY KAMONS
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington DC 20044
Telephone: (202) 514-5260
Facsimile: (202) 616-2427
Email: rachael.kamons@usdoj.gov

Of Counsel:
ROBERTO X. BUSÓ
Associate Regional Counsel
U.S. EPA Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960
Telephone: (404) 562-8530

42

**ATTORNEYS FOR THE STATE OF TENNESSEE:**

HERBERT H. SLATERY III (9077)
Attorney General and Reporter

ELIZABETH P. MCCARTER (10531)
Senior Assistant Attorney General
Office of the Attorney General
Environmental Division
P.O. Box 20207
Nashville, TN 37202
Phone: (615) 532-2582
Facsimile: (615) 741-8151

43